U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

MAY 28 2009

AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **INDICTMENT** |
| | *5:* 09-CR-319 (DNH) |
| **v.** | |
| | 18 U.S.C. § 371 - conspiracy to violate |
| **CERTIFIED ENVIRONMENTAL** | Clean Air Act, Toxic Substances |
| **SERVICES, INC.,** | Control Act and Mail Fraud Statute |
| **BARBARA DUCHENE,** | And to Defraud the United States; |
| **NICOLE COPELAND,** | 42 U.S.C. § 7413(c) & 18 U.S.C. § 2 - |
| **ELISA DUNN,** | Clean Air Act Violations |
| **SANDY ALLEN,** | 18 U.S.C. § 1341 - Mail Fraud |
| **THOMAS JULIANO, and** | 18 U.S.C. § 1001- False Statements |
| **FRANK ONOFF,** | |

**Defendants**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### THE GRAND JURY CHARGES:

### PARTIES

At all times material to this Indictment:

A.      **CERTIFIED ENVIRONMENTAL SERVICES, INC.** (hereafter "CES"), a

defendant in this Indictment, was a New York State corporation engaged in the business of,

among other things, conducting air sampling and performing laboratory analysis during and at the

conclusion of asbestos abatement (removal) projects. As a corporation, **CES** acted through its

owners and employees.

B.      **BARBARA DUCHENE,** a defendant in this Indictment, was an owner of

**CES**, Vice President of Laboratory Operations, and Laboratory Manager.

C.      **NICOLE COPELAND**, a defendant in this Indictment, was a **CES** supervisor responsible for overseeing the air monitoring programs during asbestos abatement projects to ensure that, among other things, required sampling techniques were used and samples were taken as required in order to generate accurate results.

D.      **ELISA DUNN,** a defendant in this Indictment, was also a **CES** supervisor in charge of the asbestos air monitoring program. At times, she also conducted sampling herself. **ELISA DUNN** reported to **NICOLE COPELAND**, among others at **CES.**

E.      **SANDY ALLEN,** a defendant in this Indictment, was a **CES** air technician.

F.      **THOMAS JULIANO,** a defendant in this Indictment, was a **CES** air technician.

G.      **FRANK ONOFF,** a defendant in this Indictment, was a supervisor for Paragon Environmental Construction, Inc. (PEC), which was an asbestos abatement company – i.e., a company engaged in the identifying, removing, stripping, containing, bagging, and disposing of asbestos.

## STATUTORY & REGULATORY BACKGROUND

H.      Congress and the EPA have determined that asbestos is a "hazardous" air pollutant. Congress has found that medical science has established no minimum level of exposure to asbestos fibers which is considered safe to exposed persons.  20 U.S.C. § 3601(a)(3).

I.      "Friable asbestos material," as used in this Indictment means any material containing more than one percent (1%) asbestos, as determined by approved EPA methodologies, that, when dry, can be crumbled, pulverized or reduced to powder by hand pressure.

J.      Demolition and renovation activities are regulated under the Clean Air Act when they involve at least 260 linear feet, 160 square feet or 1 cubic meter (where the length or area

could not be measured previously) of regulated asbestos-containing material (hereafter RACM or asbestos), which includes friable asbestos material.

K.     "Owner or Operator of a demolition or renovation activity" means any person who owns, leases, operates, controls or supervises the facility being demolished or renovated or any person who owns, leases, operates, controls or supervises the demolition or renovation operation, or both.

L.     The Clean Air Act's asbestos work practice standards describe the appropriate procedures for the notification and safe handling, stripping, removal and disposal of regulated asbestos containing material (RACM or, hereafter "asbestos") during renovation or demolition to prevent emissions of particulate asbestos material into the air.  These work practice standards require, in pertinent part, that:

i.     to determine the requirements for proper building renovation or demolition, prior to commencement, the owner or operator must cause the affected facility to be "thoroughly inspected" for the presence of asbestos;

ii.     the owner or operator must provide the EPA Administrator with written notice of the intention to renovate or demolish a facility containing regulated asbestos material ten days before the activity begins;

iii.     the owner or operator must have present during the renovation or demolition project a foreman, management-level person or other authorized representative, trained in compliance with the asbestos regulations;

iv.     friable asbestos materials must be adequately wetted when  being stripped from facility components;

3

v.      friable asbestos materials that have been removed or stripped must remain adequately wetted until they are packed and sealed in leak-tight containers or wrappings;

vi.     friable asbestos waste containers transported off the facility site must be marked with labels that state the name of the asbestos waste generator and the location at which the waste was generated;

vii.    the owner or operator must maintain waste shipment records that contain the information set forth in 40 C.F.R. § 61.150(d)(1) through (5);

viii.   the waste generator must deposit friable asbestos-containing materials and other components containing or covered with asbestos-containing materials as soon as practical at a disposal site authorized to accept asbestos.

M.     EPA, United States Department of Labor, Occupational Safety and Health (OSHA) and New York State administer laws and regulations governing how asbestos must be abated, and sampling methodology and analysis to verify the effectiveness of the abatement.

N.     EPA regulations entitled "Asbestos-Containing Materials In Schools" provide that, for each asbestos removal, encapsulation and enclosure project, a person designated by the local education agency shall conduct air sampling using aggressive sampling; that is, prior to sampling the floors, ceiling and walls shall be swept with the exhaust of a leaf blower and the air from fan(s) shall be directed at the ceiling.

O.     OSHA regulations entitled "Toxic and Hazardous Substances," require that each employer conducting various asbestos abatement work must have air monitoring analysis performed during the work to accurately determine the airborne concentration of asbestos to which employees may be exposed. Such air analysis is referred to herein as "OSHA Personals."

4

To conduct air analysis on OSHA Personals, analysts must be trained in, and utilize, required methodologies set by the National Institute of Safety and Health (NIOSH). Each air monitor must be given a respirator and fit tested for its use, pursuant to OSHA regulations.

      P.     New York State Department of Labor (DOL) asbestos regulations ("Code Rule 56") require that, for "large" and "small" projects, background, pre-abatement and final air clearance sample analysis be performed to verify fiber concentrations and to ensure that the asbestos has been removed so that the public would not be endangered by returning to the building. For large projects, samples are required to be taken during the abatement to measure air contaminate levels outside of the containment area where the public may be present. Final air clearance samples that fail are required to be sent to the New York State Department of Labor.

      Q.     Pursuant to Code Rule 56, the air sampling technician shall not commence final air clearance sampling within the work area until: i) wet cleaning has been completed which has eliminated asbestos contamination from surfaces, equipment or other objects; ii) no visible pools of liquid or condensation remain.

      R.     Prior to commencing final air clearance sampling, the air sampling technician must prepare the area to be sampled utilizing "aggressive air sampling techniques." Such techniques require that the air be agitated by the exhaust of forced air equipment (a leaf blower) directed against the walls, ceiling, floors, ledges and other surfaces in the room for at least five minutes per 1,000 square feet of floor. Thereafter, fan(s) (one fan per 10,000 cubic feet of room space) must thereafter be placed in the center of each room, be operated on slow speed, and be pointed toward the ceiling during sampling.

      S.     Pursuant to Code Rule 56 (and TSCA/AHERA within elementary and

5

secondary schools), no samples or analysis of samples may be performed by any party who is involved with the abatement project.  Those who own or control an asbestos contracting company may not also own or control the air monitoring company or laboratory performing the sampling or analysis.

### COUNT 1

1.     Each and every preceding paragraph is incorporated by reference herein.

2.     Beginning in or about 1999 through 2007, the exact dates being unknown to the Grand Jury, within the Northern District of New York and elsewhere, the defendants,

**CES, BARBARA DUCHENE, NICOLE COPELAND,
ELISA DUNN, SANDY ALLEN, THOMAS JULIANO,
and FRANK ONOFF**

did combine, confederate, conspire and agree together and with others both known and unknown to the grand jury (i) to defraud the United States by impeding and impairing the governmental functions of the U.S. Environmental Protection Agency and U.S. Department of Labor, Occupational Safety and Health Administration (OSHA) for assuring that those performing asbestos abatement and sampling/analysis activities comply with environmental and worker-safety laws designed to protect the human health and the environment and (ii) to knowingly commit offenses against the United States, that is to:

a.     violate the Clean Air Act, 42 U.S.C. §§ 7412(b) and (h) and 7413(c)(1), related to regulated asbestos containing material (hereafter "asbestos") renovation and demolition activities involving the notification, stripping, bagging, removal and disposal,  performed contrary to asbestos regulations, 40 C.F.R. §§ 61.145; 61.150 and 61.154;

6

b.      violate the Toxic Substances Control Act, 15 U.S.C. § 2501, *et seq.* and AHERA regulations promulgated thereunder, related to sampling in public schools without aggressive sampling techniques and related to conflicts of interest where an air monitoring company/laboratory is owned by the owner of an asbestos abatement company and used on the same abatement project(s); and

c.      violate the mail fraud statute, 18 U.S.C. § 1341, related to a scheme and artifice with intent to defraud clients and to obtain money and property by means of false and fraudulent pretenses, representations and promises that abatement work and/or sampling or analysis would be done in compliance with federal and state regulations and standards, furthered by the causing of items to be sent by United States Postal Service or by private or commercial interstate carrier (hereafter "mail") including bids, letters, waste manifests, invoices, laboratory samples and reports, and other documents.

## MEANS AND MANNER

3.      In furtherance of the conspiracy, abatement contractors performed asbestos abatement in violation of federal and/or state laws and regulations.

4.      In furtherance of the conspiracy, air monitors and laboratory personnel performed sampling and analysis in violation of federal and/or state laws and regulations, including when visible debris remained and the projects were thus not permitted to be sampled for final clearances.

5.      In furtherance of the conspiracy, abatement contractors submitted bids, entered into contracts, created documents and/or stated verbally to clients/client representatives that they

7

would comply with federal and/or state asbestos regulations with regard to asbestos abatement despite not intending to do so.

6.      In furtherance of the conspiracy, **CES** through its representatives, submitted bids, entered into contracts, created documents and/or stated verbally to clients/client representatives that it would comply with federal and/or state asbestos regulations, with regard to asbestos sampling and analysis despite not intending to do so.

7.      In furtherance of the conspiracy, **CES** created or obtained false air monitoring sample results that did not accurately reflect true conditions within the facility and provided, and caused to be provided, copies to clients/building owners as proof that asbestos had been removed and that the buildings in question were safe to reoccupy.

8.      In furtherance of the conspiracy, abatement contractors and **CES** submitted invoices to clients for work that was not performed in compliance with law contrary to prior representations to clients that it would be.

9.      In furtherance of the conspiracy, co-conspirators concealed and covered up their illegal activities by, among other things, making false statements to inspectors, regulators and law enforcement personnel and preparing false and fraudulent documents.

10.      Throughout the conspiracy, **NICOLE COPELAND** and **CES** often provided respirators to **CES** air monitors without conducting proper fit testing to ensure the respirator sealed properly against the face of the technician so as to prevent asbestos fibers from being inhaled. **NICOLE COPELAND** falsified related **CES** paperwork to make it appear that proper fit testing had occurred.

11.     Throughout the conspiracy, **CES** employees often failed to adhere to decontamination procedures when leaving asbestos work areas.

12.     Throughout the conspiracy **CES** employees often did not wear respirators when inside the asbestos work area(s) where asbestos had been or was being removed.

13.     Throughout the conspiracy, **CES** employees often falsified air monitoring data sheets, by, among other things, setting forth inaccurate times for when they turned on and/or off air monitoring pumps and logged air monitoring cassettes into the **CES** laboratory.

14.     Throughout the conspiracy, **CES** employees often did not calibrate their air pumps to ensure accurate air monitoring readings, as is required at the start and finish for each sample taken.

15.     Throughout the conspiracy, **CES** employees often commenced final air clearance sampling before the required waiting period had concluded.

16.     Throughout the conspiracy, **BARBARA DUCHENE** and **CES** allowed "PCM" analysis and OSHA Personal analysis to be conducted by analysts who had not been fully trained in methodologies required for such analysis.

17.     During the conspiracy, pursuant to the request of **NICOLE COPELAND**, a PCM laboratory technician routinely failed to count fibers that should have been counted under proper PCM methodology.

18.     Throughout the conspiracy, **CES** did not conduct required inter-laboratory and intra-laboratory quality control measures.

19.     Throughout the conspiracy, **CES** was owned by an individual who also owned an asbestos abatement company, and the two companies performed abatement and air

9

monitoring/laboratory analysis on the same projects, contrary to regulations barring such conflicts of interest.

## OVERT ACTS

To effectuate the conspiracy, co-conspirators performed at least one of the following overt acts within the Northern District of New York and elsewhere:

20.     On or about April 27, 2004, **CES** falsely informed an inspector from the NYS Environmental Laboratory Accreditation Program (ELAP) that the primary **CES** PCM analyst was still in training when, in fact, she was independently and without supervision, then performing the vast majority of its PCM analysis.

### Oneonta Job Corps, 21 Homer Folks Avenue, Oneonta, New York

21.     On or about April 14, 2003 AAPEX Environmental Services, Inc., mailed a written proposal to Rand & Jones Enterprise, Inc., Liverpool, New York for the removal of 90 linear feet of asbestos containing pipe insulation from an attic located on the campus of the Oneonta Job Corps, 21 Homer Folks Avenue, Oneonta, New York.

22.     On or about April 14, 2003 **NICOLE COPELAND** signed a letter addressed to John Leathley, AAPEX Environmental Services, Inc., owner, which stated, in part,  that **CES** would follow New York State Code Rule 56 Regulations at the Oneonta Job Corps asbestos abatement project.

23.     On or about May 7, 2003 **CES** initiated final air monitoring clearances even though AAPEX failed to complete prerequisites to such air monitoring, including:

a.     properly pre-cleaning the asbestos project work area;

10

b.      adequately wetting the asbestos and ensuring that it remained wet until collected and contained or treated in preparation for disposal;

c.      properly pre-cleaning the asbestos project work area;

d.      adequately wetting the asbestos and ensuring that it remained wet until collected and contained or treated in preparation for disposal;

e.      conducting a final wet-clean.

24.     On or about May 14, 2003 **CES** mailed fraudulent final air monitoring clearance reports to AAPEX even though:

a.      **CES** did not previously conduct proper final asbestos air clearance monitoring;

b.      AAPEX did not dispose of asbestos-containing waste as soon as practical.

**WSTM, 1030 James Street, Syracuse, New York**

25.     On or about August 2, 2004 to February 10, 2005 **CES** initiated final air monitoring clearances at 1030 James Street, Syracuse, New York even though AAPEX failed to complete prerequisites to such air monitoring, including:

a.      adequately wetting the asbestos material and ensuring that it remained wet until collected and contained or treated in preparation for disposal.

b.      conducting a final wet-clean.

26.     On or about August 9, 2004, October 5, 2004 and February 10, 2005, **CES** mailed fraudulent final air monitoring clearance reports to AAPEX even though:

a.      AAPEX did not dispose of asbestos containing waste as soon as practical.

b.      **CES** did not properly conduct final asbestos air monitoring clearances.

11

**403-405 Tulip Street, Liverpool, New York**

27.     On or about July 29, 2004 AAPEX submitted a notification to the New York State DPL involving the removal of 750 linear feet of friable asbestos from 403-405 Tulip Street, Liverpool, NY. The work was to be conducted under Code Rule 56 and applicable variance 108.

28.     On or about August 18, 2004, **CES** initiated final air monitoring clearances at 403-405 Tulip Street, Liverpool, New York even though AAPEX failed to complete prerequisites to such air monitoring, including:

a.     properly pre-cleaning the asbestos project work area prior to commencing asbestos abatement activities.

b.     adequately wetting the asbestos material and ensuring that it remained wet until collected and contained or treated in preparation for disposal.

c.     conducting a final wet-clean.

29.     On or about August 19, 2004 **CES** mailed fraudulent final air monitoring clearance reports to AAPEX even though:

a.     AAPEX did not dispose of asbestos containing waste as soon as practical.

b.     **CES** did not properly conduct final asbestos air monitoring clearances.

**Rothschild Development, 805 East Genesee Street, Syracuse, New York**

30.     On or about June 28, 2005 AAPEX mailed a written estimate to a representative of Roy Stanley Inc., Syracuse, New York involving the removal of

12

approximately 607 linear feet of friable asbestos pipe insulation and duct work from the basement area and back room of 805 East Genesee Street, Syracuse, New York. The work was to be conducted under New York State Code Rule 56.

31.    On or about July 27, 2005, **CES** initiated final air monitoring clearances at 805 East Genesee Street, Syracuse, New York even though AAPEX failed to complete prerequisites to such air monitoring, including:

a.    properly pre-cleaning the asbestos project work area prior to commencing asbestos abatement activities.

b.    adequately wetting the asbestos material and ensuring that it remained wet until collected and contained or treated in preparation for disposal.

c.    conducting a final wet-clean.

32.    On or about August 3, 2005 **CES** mailed a fraudulent final air monitoring clearance report to AAPEX even though:

a.    AAPEX did not dispose of asbestos containing waste as soon as practical.

b.    **CES** did not properly conduct final asbestos air monitoring clearances.

**Alpha Chi Omega, 705 Walnut Street, Syracuse, New York**

33.    On or about August 15, 2007 **NICOLE COPELAND** caused a letter to be mailed from **CES** addressed to Mr. Gary Frost of G.F. Frost Construction, which stated that **CES**, would follow New York State Code Rule 56 Regulations.

13

34.    On or about August 22, 2007 and August 23, 2007, **CES** and **ELISA DUNN** prepared fraudulent documents stating that they had conducted a visual inspection of the basement work area and it was free of debris.

35.    On or about August 22 and 23, 2007 **CES** initiated final air monitoring clearances at 705 Walnut Street, Syracuse, New York, even though:

a.    Summit Environmental Services did not adequately wet the asbestos material and ensure that it remained wet until collected and contained or treated in preparation for disposal.

b.    **CES** and **ELISA DUNN** did not conduct a proper visual inspections.

c.    Summit Environmental Services did not conduct a proper final wet-cleans.

36.    On or about September 26, 2007 **CES** and **NICOLE COPELAND** mailed a close-out package to G.F. Frost containing fraudulent asbestos air monitoring clearances even though:

a.    **CES** and **ELISA DUNN** did not properly conduct final asbestos air monitoring clearances.

b.    Summit Environmental Services did not dispose of asbestos containing waste as soon as practical.

**Raymour & Flanagan Warehouse, Morgan Road, Liverpool, New York**

37.    On or about June 29, 2006 Paragon Environmental Construction entered into a contract to remove asbestos contaminated material from the Gaylord Building in compliance with New York state Department of Labor and EPA asbestos requirements.

38.    On or about July 19, 2006 to August 4, 2006 Paragon Environmental Construction Company and **FRANK ONOFF** commenced asbestos abatement activities without properly pre-cleaning the asbestos project work area.

39.    On or about July 19, 2006 to August 4, 2006 Paragon Environmental Construction Company and **FRANK ONOFF** conducted asbestos-abatement activities at the Raymour & Flanagan Warehouse without adequately wetting the asbestos material and ensuring that it remained wet until collected and contained or treated in preparation for disposal.

40.    On or about August 4, 2006 Paragon Environmental Construction Company and **FRANK ONOFF** engaged in asbestos-abatement activities without disposing of asbestos containing waste as soon as practical.

41.    On or about August 4, 2006 **CES** initiated final air monitoring clearances even though Paragon Environmental Construction Company and **FRANK ONOFF** did not conduct a final wet-clean.

42.    On or about August 8, 2006 **CES** mailed fraudulent final air monitoring clearance reports to Paragon Environmental Construction Company even though neither

**THOMAS JULIANO** nor **CES** properly conducted final asbestos air monitoring clearances.

## Kellogg Library, Route 26, Cincinnatus, New York

43.    On or about May 2, 2006 Paragon Environmental Construction entered into a contract to remove asbestos contaminated material from the Kellogg Free Library in compliance with New York state Department of Labor and EPA asbestos requirements.

44.    On or about June 15, 2006 to June 29, 2006 Paragon Environmental Construction Company and **FRANK ONOFF** engaged in asbestos-abatement activities at the Kellogg Library without adequately wetting the asbestos material and ensuring that it remained wet until collected and contained or treated in preparation for disposal.

45.    On or about June 29, 2006  **CES** initiated final air monitoring clearances at the Kellogg Library even though Paragon Environmental Construction Company and **FRANK ONOFF** did not conduct a final wet-clean.

46.    On or about June 30, 2006, **CES** mailed fraudulent final air monitoring clearance reports to Paragon Environmental Construction Company even though:

a.    Paragon Environmental Construction Company and **FRANK ONOFF** did not dispose of asbestos containing waste as soon as practical.

b.    **CES** and Brent Leone did not properly conduct final asbestos air monitoring clearances.

## 155 Kappesser Street, Syracuse, New York

47.     On or about November 4, 2004 to November 15, 2004 **CES** conducted final asbestos air monitoring clearances without Paragon Environmental Construction Company conducting a final wet clean.

48.     On or about November 4, 2004 and November 15, 2004 **CES** conducted fraudulent asbestos air monitoring clearances.

49.     On or about November 9, 2004 and November 16, 2004 **CES** mailed fraudulent asbestos air monitoring clearance reports to Paragon Environmental Construction.

## 104 Court Street, Wampsville, New York 13163

50.     On or about December 28, 2005, **CES** mailed a fraudulent final asbestos air monitoring clearance report to AAPEX even though **CES** and **SANDY ALLEN** did not take proper final air monitoring clearances.

51.     On or about February 6, 2006, the Madison County Department of Social Services mailed a payment to AAPEX from federal funds under the Home Energy Assistance Program.

52.     On or about March 6, 2006 **CES** mailed a fraudulent invoice to AAPEX even though **CES** did not take proper final air monitoring clearances.

## 6849 Woodchuck Hill Road, Fayetteville, New York

53.     On or about August 17, 2006, **CES** mailed fraudulent final air clearance reports to EPS and subsequently caused them to be mailed to the property owner of 6849

Woodchuck Hill Road, Fayetteville, New York, even though **CES** did not conduct proper final air monitoring clearances.

## POMCO, Syracuse, New York

54.     On or about September 7, 2004 and September 20, 2004 **CES** mailed fraudulent asbestos air monitoring clearance reports to EPS even though **CES** did not conduct proper final air monitoring clearances at 2450-2453 James Street, Syracuse, New York.

55.     On or about August 20 and August 23, 2004, **CES** caused to be mailed fraudulent asbestos final clearance reports to EPS and subsequently mailed to POMCO even though **CES** did not conduct proper final asbestos air monitoring clearances at 2345 James Street, Syracuse, New York.

56.     On or about September 1, 2004, **CES** mailed fraudulent asbestos final clearance reports to EPS and caused to be subsequently mailed to POMCO even though **CES** did not conduct proper final asbestos air monitoring clearances at 120 North Street, Syracuse, New York.

## LeMoyne College, Syracuse, New York

57.     On or about December 27, 2005, and January 4, 2006, **CES** mailed fraudulent asbestos final clearance reports to EPS and caused them to be subsequently mailed to LeMoyne College even though **CES** did not conduct proper final asbestos air monitoring clearances at Grewen Hall.

58.     On or about June 19, 2006 and June 22, 2006, **CES** mailed fraudulent final air monitoring clearance reports to EPS and caused them to be subsequently mailed to LeMoyne College even though **CES** did not conduct proper final asbestos air monitoring clearances on the second and third floors of Mitchell Hall.

59.     On or about May 24, 2005, **CES** mailed fraudulent final air monitoring clearance reports to EPS and caused them to be subsequently mailed to LeMoyne College even though **CES** did not conduct proper final asbestos air monitoring clearances at Dablon Hall.

60.     On or about May 25, 2006, June 1, 2006, and June 5, 2006 **CES** mailed fraudulent asbestos final clearance reports to EPS and caused them to be subsequently mailed to LeMoyne College even though **CES** did not conduct proper final asbestos air monitoring clearances at  Foery Hall.

61.     On or about June 30, 2006 and July 13, 2006, **CES** mailed fraudulent final air monitoring clearance reports to EPS and caused them to be subsequently mailed to LeMoyne College even though **CES** did not conduct proper final asbestos air monitoring clearances on the third floor of Grewen Hall.

**Morgan Road Elementary School, Liverpool, New York.**

62.     On or about July 8, 2004 **CES** mailed fraudulent final asbestos air monitoring clearance reports to EPS and caused them to be subsequently mailed to Liverpool Central School District, Morgan Road Elementary School, even though **CES**

19

did not conduct proper final asbestos air monitoring clearances.

## Syracuse University

63.     On or about February 18, 2004 and March 4, 2004 **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances related to its Link Hall project.

64.     On or about August 3, 2005 **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for Archibold Gym, ROTC Storage Room, Syracuse, New York.

65.     On or about August 24, 2005, August 30, 2005, and September 30, 2005 **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for 403 Comstock Avenue, Syracuse, New York.

66.     On or about May 25, 2006 and May 26, 2006 **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for New House II, 100 University Avenue, Syracuse, New York.

67.     On or about May 4, 2004, June 17, 2004, June 21, 2004, June 29, 2004, July 2, 2004, August 9, 2004, August 10, 2004, August 13, 2004, August 16, 2004, February

15, 2005, February 21, 2005, February 22, 2005, February 28, 2005, March 1, 2005,

March 3, 2005, March 7, 2005, March 9, 2005, March 11, 2005, March 18, 2005, March

21, 2005, March 29, 2005,  March 31, 2005, April 29, 2005, August 3, 2005, August 5,

2005, August 9, 2005, August 16, 2005, September 2, 2005, September 20, 2005, May 5,

2006, and June 26, 2006, **CES** mailed fraudulent final asbestos air monitoring clearance

reports to Syracuse University even though **CES** did not conduct proper final asbestos air

monitoring clearances for Hinds Hall, 100 University Avenue, Syracuse, New York.

68.     On or about  May 17, 2004, May 19, 2004, May 20, 2004, May 24, 2004,

May 28, 2004, June 2, 2004, June 8, 2004, June 9, 2004, June 11, 2004, June 14, 2004,

and June 15, 2004, **CES** mailed fraudulent final asbestos air monitoring clearance reports

to  Syracuse University even though **CES** did not conduct proper final asbestos air

monitoring clearances for Brewster Hall, Syracuse, New York.

69.     On or about  May 31, 2005, June 1, 2005, June 6, 2005, June 8, 2005, June

9, 2005, June 13, 2005, June 14, 2005, and June 22, 2005, **CES** mailed fraudulent final

asbestos air monitoring clearance reports to  Syracuse University even though **CES** did

not conduct proper final asbestos air monitoring clearances for Brewster Hall, Syracuse,

New York.

70.     On or about  July 21, 2005, and July 25, 2005 **CES** mailed fraudulent final

asbestos air monitoring clearance reports to  Syracuse University even though **CES** did

not conduct proper final asbestos air monitoring clearances for Brockway Hall, Syracuse, New York.

71.     On or about August 26, 2005, August 30, 2005, August 23, 2005 **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for the School of Nursing, Syracuse, New York.

72.     On or about April 20, 2006, May 10, 2006, August 25, 2006, August 29, 2006, August 31, 2006, and September 12, 2006, **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for Slocum Hall, Syracuse, New York.

73.     On or about May 4, 2006, May 5, 2006, June 14, 2006, June 15, 2006, **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for Lyman Hall, Syracuse, New York.

74.     On or about June 6, 2006, June 8, 2006, June 9, 2006, and June 12, 2006, **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for Flint Hall, Syracuse, New York.

75.     On or about June 30, 2006, July 10, 2006, and July 19, 2006, **CES** mailed fraudulent final asbestos air monitoring clearance reports to Syracuse University even though **CES** did not conduct proper final asbestos air monitoring clearances for Link Hall, Syracuse, New York.

**Holy Cross School, Dewitt, NY.**

76.     On or about June 9, 2006 and June 12, 2006 **CES** conducted final air clearance monitoring without aggressive sampling at the Holy Cross School, Dewitt, NY

77.     On or about June 12 and 14, 2006, **CES** mailed fraudulent final air clearance laboratory reports to Holy Cross School.

**Temple Beth-El, 3528 East Genesee Street, Syracuse, New York**

78.     On or about April 30, 2001 **CES** and **SANDY ALLEN** prepared fraudulent air monitoring reports for the Temple Beth-El, 3528, East Genesee Street, Syracuse, New York.

79.     Fraudulent final air monitoring clearance reports were subsequently mailed by **CES** to AAPEX on behalf of the owner of 3528 East Genesee Street, Syracuse, New York.

**Seneca Federal Savings Bank, 35 Oswego Street, Baldwinsville, New York**

80.     On or about September 12, 2005 **CES** and one of its air monitors conducted fraudulent final asbestos air monitoring clearances at the Seneca Federal Savings Bank,

35 Oswego Street, Baldwinsville, New York; fraudulent final asbestos air monitoring clearance reports were mailed by **CES** to AAPEX and were provided to the client.

## Cicero North Syracuse/Roxboro Middle School

81.    On or about July 5, July 9, July 11, and July 22, 2005, **CES** failed to conduct proper asbestos final air clearance sampling at Cicero North Syracuse/Roxboro Middle School, North Syracuse, New York.

82.    On or about April 13, 2006, **CES** and **SANDY ALLEN** failed to conduct proper final asbestos air clearance sampling at Cicero North Syracuse/Roxboro Middle School, North Syracuse, NY.

## Cazenovia Flower Shop, Cazenovia, NY

83.    On or about October 25, 2006 **CES** and **ELISA DUNN** failed to conduct proper final asbestos air monitoring clearance sampling at the Cazenovia Flower Shop, Route 20, Cazenovia, NY.

All in violation of 18 U.S.C. § 371.

## COUNTS 2 - 7

84.    Each and every preceding paragraph is incorporated as if fully set forth herein.

85.    On or about the dates set forth below (the exact dates being unknown to the Grand Jury), and for the projects set forth below, which projects involved at least 260

linear feet, 160 square feet or one cubic meter of regulated asbestos containing material,

the defendant(s) listed below, by causing false and fraudulent air monitoring reports to be

produced, did knowingly aid and abet the following acts that violated the Clean Air Act

and NESHAP asbestos work practice standards contained in 40 C.F.R. Part 61, subpart

M, as described more fully in the preceding paragraphs: follows:

| COUNT | DEFENDANT(S) | APPROX. DATES | PROJECT AND ABATEMENT CONTRACTOR | CLEAN AIR ACT/NESHAP VIOLATION |
|---|---|---|---|---|
| 2 | CES, SANDY ALLEN, NICOLE COPELAND | Aug. 9, 2004 through Feb. 10, 2005 | WSTM, CHANNEL 3 TV, 1030 James Street, Syracuse, NY<br><br>AAPEX | Failure to adequately wet/maintain wet until contained, ¶ 15(e); improper disposal, ¶ 15(h) |
| 3 | CES, NICOLE COPELAND | Aug. 16, 2004 through Aug. 18, 2004 | 403 THROUGH 405 TULIP STREET, Liverpool, NY<br><br>AAPEX | Failure to Notify, ¶ 15(b); failure to adequately wet/maintain wet until contained, ¶ 15(e); improper disposal, ¶ 15(h) |
| 4 | CES, NICOLE COPELAND | July 14, 2005 through July 27, 2005 | ROTHCHILD DEVELOPMENT, 705 Genesee Street, Syracuse, NY<br><br>AAPEX | Failure to adequately wet/maintain wet until contained, ¶ 15(e); improper disposal, ¶ 15(h) |

| COUNT | DEFENDANT(S) | APPROX. DATES | PROJECT AND ABATEMENT CONTRACTOR | CLEAN AIR ACT/NESHAP VIOLATION |
|---|---|---|---|---|
| 5 | CES, THOMAS JULIANO, FRANK ONOFF, NICOLE COPELAND | July 19, 2006 through August 4, 2006 | RAYMOUR & FLANAGAN WAREHOUSE, 7248 Morgan Road, Liverpool, NY<br><br>PARAGON | Failure to adequately wet/maintain wet until contained, ¶ 15(e); improper disposal, ¶ 15(h) |
| 6 | CES, FRANK ONOFF, NICOLE COPELAND | June 15, 2006 though June 29, 2006 | KELLOGG FREE LIBRARY, Route 26, Cincinnatus, NY<br><br>PARAGON | False Notification (under- reporting amount of asbestos), ¶ 15(b); Failure to adequately wet/maintain wet until contained, ¶ 15(e); improper disposal, ¶ 15(h) |
| 7 | CES, ELISA DUNN NICOLE COPELAND | Aug. 17, 2007 though Aug. 23, 2007 | ALPHA CHI OMEGA, (SYRACUSE UNIVERSITY SORORITY HOUSE) 705 Walnut Street, Syracuse, NY<br><br>PARAGON | Failure to adequately wet/maintain wet until contained, ¶ 15(e); improper disposal, ¶ 15(h); ELISA DUNN also personally engaged in cleanup activities during which she engaged in improper disposal of asbestos. |

In violation of 42 U.S.C. § 7413(c)(1) and (2) and 18 U.S.C. § 2.

## COUNT 8
### (Mail Fraud Related to 155 KAPPESSER STREET)

86.     From October 2004 through December 2004, the exact dates being unknown, in the Northern District of New York, defendants, **FRANK ONOFF NICOLE COPELAND**, and **CES**, together with others uncharged herein, devised and intended to devise a scheme and artifice (i) to defraud the owner of 155 Kappesser Street, Syracuse, New York and his representative in connection with an asbestos abatement project by Paragon Environmental Construction, Inc. ("PEC") for which **CES** provided air monitoring services, and (ii) to obtain the money and property of the victims by means of false and fraudulent pretenses, representations and promises, that a) the asbestos at issue would be all removed and b) asbestos abatement, air monitoring and laboratory work would be and/or had been performed in accordance with applicable regulations and standards.

87.     It was part of the scheme to defraud that on or about October 22, 2004 PEC agreed to perform asbestos abatement at 155 Kappesser Street, in compliance with applicable law.

88.     It was part of the scheme to defraud that on or about October 20, 2004 through November 15, 2004 **FRANK ONOFF** performed, and directed others to perform, asbestos abatement work at 155 Kappesser Street, that was not in compliance with law and which left asbestos debris behind in the work area.

89.     It was part of the scheme and artifice to defraud that **NICOLE COPELAND** assigned to this job a **CES** employee whom she directed to engage in final

air clearance sampling without engaging in aggressive air monitoring as required by Code Rule 56.

90.   It was part of the scheme to defraud that from on or about November 4, 2004 through November 15, 2004, PEC failed to conduct a final wet clean prior to **CES** conducting final asbestos air monitoring clearances.

91.   It was part of the scheme to defraud that from on or about November 4, 2004 and November 15, 2004, a **CES** air monitor conducted fraudulent final asbestos air sampling clearances.

92.   It was part of the scheme to defraud that the defendants conducted themselves in a manner to deceive the property owner into believing that the asbestos abatement had been done, that all of the asbestos had been removed, that the facility was safe to reoccupy, and that payment to PEC and **CES** should be made.

93.   For the purpose of executing, and attempting to execute the above-described scheme and artifice, defendants

**FRANK ONOFF**
**NICOLE COPELAND, and**
**CES**

did knowingly cause to be delivered, from and/or to the Northern District of New York, by mail or by private or commercial interstate carrier, according to the direction thereon the following items on or about the following dates:

a.   On or about November 9, 2004 and November 16, 2004 **CES** mailed fraudulent final air clearance laboratory reports to PEC.

28

b.    In or about December 2004 and February 2005 PEC mailed invoices to the client requesting payment for asbestos services conducted at 155 Kappesser Street, Syracuse, New York.

All in violation of 18 U.S.C. § 1341 and § 2.

## COUNT 9
## (Mail Fraud Related to 104 Court Street, Wampsville, NY)

94.    On or about December 28, 2005, the exact dates unknown, in the Northern District of New York, **SANDY ALLEN** and **CES**, defendants, and together with others uncharged herein, devised and intended to devise a scheme and artifice (i) to defraud Madison County and the owner of 104 Court Street, Wampsville, NY in connection with an asbestos abatement project by AAPEX Environmental Services, Inc. ("AAPEX") for which **CES** provided air monitoring services, and (ii) to obtain money and property from those victims by means of false and fraudulent pretenses, representations and promises, that a) the asbestos at issue would be all removed, b) asbestos abatement, air monitoring and laboratory work would be and/or had been performed in accordance with applicable regulations/standards.

95.    It was part of the scheme to defraud that on or about November 3, 2005, APPEX agreed to remove asbestos tape from a boiler at 104 Court Street, Wampsville, NY.

96.   It was part of the scheme to defraud that on or about December 28, 2005, AAPEX performed asbestos abatement work at 104 Court Street that was not in compliance with law and which left asbestos debris behind in the work area.

97.   It was part of the scheme and artifice to defraud that **SANDY ALLEN** and **CES** engaged in final air clearance sampling without aggressive air monitoring as required by Code Rule 56.

98.   It was part of the scheme and artifice to defraud that, on or about December 28, 2005, AAPEX failed to conduct a final wet clean prior to **SANDY ALLEN** and **CES** conducting final asbestos air monitoring clearances.

99.   It was part of the scheme and artifice to defraud that, on or about December 28, 2005, **SANDY ALLEN** and **CES** conducted fraudulent final asbestos air sampling clearances.

100.   It was part of the scheme to defraud that the defendants conducted themselves in a manner to deceive the property owner into believing that the asbestos abatement had been done, that all of the asbestos had been removed, that the facility was safe to reoccupy, and that payment to APPEX and **CES** should be made.

101.   For the purpose of executing, and attempting to execute the above-described scheme and artifice, defendants

**SANDY ALLEN and
CES**

did knowingly cause to be delivered, from and/or to the Northern District of New York,

by mail or by private or commercial interstate carrier, according to the direction thereon

the following items on or about the following dates:

a.   On or about January 4, 2006 **CES** mailed a fraudulent final air clearance

laboratory report.

b.   On or about January 17 and March 6, 2006 **CES** mailed invoices requesting

payment for air monitoring/laboratory services conducted at 104 Court Street,

Wampsville, NY.

c.   On or about December 30, 2005 APPEX mailed invoices requesting

payment for asbestos services.

All in violation of 18 U.S.C. § 1341 and § 2.

## COUNT 10
### (Mail Fraud Related to CHANNEL 3 TV, WSTM, 1030 James Street, Syracuse, NY)

102.   From on or about August 2, 2004 through February 10, 2005, the exact

dates unknown, in the Northern District of New York, **SANDY ALLEN, NICOLE**

**COPELAND** and **CES,** defendants, and together with others uncharged herein, devised

and intended to devise a scheme and artifice (i) to defraud the owner/agent of WSTM,

Channel 3 TV, 1030 James Street, Syacuse, NY in connection with an asbestos abatement

project by AAPEX Environmental Services, Inc. ("AAPEX") for which **CES** provided air

31

monitoring services, and (ii) to obtain money and property from that victim by means of false and fraudulent pretenses, representations and promises, that a) the asbestos at issue would be all removed, b) asbestos abatement, air monitoring and laboratory work would be and/or had been performed in accordance with applicable regulations/standards.

103.   It was a part of the scheme to defraud that on or about July 9, 2004 AAPEX failed to make the required notification to the United States Environmental Protection Agency relating to this project.

104.   It was a part of the scheme to defraud that on or about August 2, 2004 through February 10, 2005, AAPEX failed to properly pre-clean the asbestos project work area prior to commencing asbestos abatement activities.

105.   It was a part of the scheme to defraud that on or about August 2, 2004 to February 10, 2005 AAPEX failed to adequately wet the asbestos material and ensure that it remained wet until collected and contained or treated in preparation for disposal.

106.   It was a part of the scheme to defraud that on or about August 2, 2004 to February 10, 2005 AAPEX failed to dispose of asbestos containing waste as soon as practical.

107.   It was a part of the scheme to defraud that on or about August 2, 2004, to February 10, 2005 AAPEX failed to conduct a final wet-clean prior to CES initiating final air monitoring clearances.

108.   It was a part of the scheme to defraud that on or about August 9, 2004, **CES** failed to properly conduct final asbestos air monitoring clearances.

109.   It was part of the scheme and artifice to defraud that on or about October 2, 2004 and February 10, 2005 **CES** and **SANDY ALLEN** failed to properly conduct final asbestos air monitoring clearances.

110.   It was part of the scheme to defraud that the defendants conducted themselves in a manner to deceive the property owner into believing that the asbestos abatement had been done, that all of the asbestos had been removed, that the facility was safe to reoccupy, and that payment to APPEX and **CES** should be made.

111.   For the purpose of executing, and attempting to execute the above-described scheme and artifice, defendants

**SANDY ALLEN,**
**NICOLE COPELAND, and**
**CES**

did knowingly cause to be delivered, from and/or to the Northern District of New York, by mail or by private or commercial interstate carrier, according to the direction thereon the following items on or about the following dates:

a.       On or about August 9, 2004, October 5, 2004 and February 10, 2005 **CES** mailed fraudulent final air monitoring clearance reports to AAPEX.

All in violation of 18 U.S.C. §§ 1341 and 2.

**COUNT 11**
**(Mail Fraud Related to RAYMOUR &FLANAGAN, LIVERPOOL, NY)**

112.    On or about June 27, 2006 through August 31, 2006, the exact dates unknown, in the Northern District of New York, **THOMAS JULIANO, FRANK ONOFF, NICOLE COPELAND**, and **CES**, defendants, and together with others uncharged herein, devised and intended to devise a scheme and artifice (i) to defraud the owner/agent of Raymour and Flanagan, Morgan Road, Liverpool, NY in connection with an asbestos abatement project by Paragon Environmental Construction, Inc. ("PEC") for which **CES** provided air monitoring services, and (ii) to obtain money and property from that victim by means of false and fraudulent pretenses, representations and promises, that a) the asbestos at issue would be all removed, b) asbestos abatement, air monitoring and laboratory work would be and/or had been performed in accordance with applicable regulations/standards.

113.    It was a part of the scheme to defraud that on or about June 27, 2006, and on July 11, 2006, PEC mailed contract/bids to Cartner Construction LLC, Liverpool, in which PEC represented that all asbestos material would be removed from the former Gaylord Building (Raymour and Flanagan Building) in accordance with Code Rule 56.

114.    It was a part of the scheme to defraud that the asbestos removal was not performed in compliance with law and as represented.

115.    It was part of the scheme to defraud that the defendants conducted themselves in a manner to deceive the property owner into believing that the asbestos

abatement had been done, that all of the asbestos had been removed, that the facility was

safe to reoccupy, and that payment to PEC and **CES** should be made.

116.    For the purpose of executing, and attempting to execute the above-

described scheme and artifice, defendants

**THOMAS JULIANO,**
**FRANK ONOFF**
**NICOLE COPELAND, and**
**CES**

did knowingly cause to be delivered, from and/or to the Northern District of New York,

by mail or by private or commercial interstate carrier, according to the direction thereon

the following items on or about the following dates:

a.      On or about August 31, 2006 PEC mailed a fraudulent invoice to Cartner

Construction, LLC Liverpool, NY, for work that was not performed as promised.

b.      On or about August 8, 2006, **CES** mailed a fraudulent final air monitoring

clearance report to PEC for work that was not performed in compliance with law, but for

which it represented work had been properly performed.

All in violation of 18 U.S.C. §§ 1341 and 2.

**COUNT 12**
**(ALPHA CHI OMEGA, 705 WALNUT STREET, SYRACUSE, NY)**

117.    On or about August 1, 2007 through September 26, 2007, the exact dates

unknown, in the Northern District of New York, **NICOLE COPELAND, ELISA DUNN**

and **CES,** defendants, and together with others uncharged herein, devised and intended to

devise a scheme and artifice (i) to defraud the owner/agent of Alph Chi Omega, 705

35

Walnut Street, Syracuse, NY in connection with an asbestos abatement project for which **CES** provided air monitoring services, and (ii) to obtain money and property from that victim by means of false and fraudulent pretenses, representations and promises, that a) the asbestos at issue would be all removed, b) asbestos abatement, air monitoring and laboratory work would be and/or had been performed in accordance with applicable regulations/standards.

118.   It was a part of the scheme to defraud that, on or about August 15, 2007, **NICOLE COPELAND** mailed a letter to Gary Frost of GF Frost construction stated that Code Rule 56 regulations would be followed.

119.   It was a part of the scheme to defraud that, on or about August 2007, the asbestos abatement project was conducted in violation of law, including that gross asbestos debris was left behind.

120.   It was part of the scheme to defraud that the defendants conducted themselves in a manner to deceive the property owner into believing that the asbestos abatement had been done, that all of the asbestos had been removed, that the facility was safe to reoccupy, and that payment to PEC and **CES** should be made.

121.   For the purpose of executing, and attempting to execute the above-described scheme and artifice, defendants **NICOLE COPELAND, ELISA DUNN, CES**

did knowingly cause to be delivered, from and/or to the Northern District of New York,

by mail or by private or commercial interstate carrier, according to the direction thereon

the following items on or about the following dates:

a.      On or about September 26, 2007, a close out package with fraudulent

"passing" air monitoring reports was mailed to CF Frost.  The documents include

fraudulent air monitoring reports and the log of **ELISA DUNN** where she states (twice)

that she observed no debris during her visual inspection, when she actually observed

substantial quantities of debris.

b.      On or about September 26, 2007 **NICOLE COPELAND** caused a

fraudulent invoice to be mailed to Gary Frost.

All in violation of 18 U.S.C. § 1341 and 2.

### COUNT 13
### (Mail Fraud Related to the Kellogg Free Library, Cincinnatus, NY)

122.    On or about April 24, 2006 through July 19, 2006, the exact dates unknown,

in the Northern District of New York, **NICOLE COPELAND, FRANK ONOFF** and

**CES,** defendants, and together with others uncharged herein, devised and intended to

devise a scheme and artifice (i) to defraud the owner/agent of Kellogg Free Library,

Route 26, Cincinnatus, NY, in connection with an asbestos abatement project for which

**CES** provided air monitoring services, and (ii) to obtain money and property from that

victim by means of false and fraudulent pretenses, representations and promises, that a)

37

the asbestos at issue would be all removed, b) asbestos abatement, air monitoring and laboratory work would be and/or had been performed in accordance with applicable regulations/standards.

123.   It was a part of the scheme to defraud that, on or about April 24, 2006, PEC mailed a letter to a representative for Kellogg Free Library which stated that the asbestos would be removed and disposed all by legal means.

124.   It was a part of the scheme to defraud that, on or about June 15 through June 29, 2006, the asbestos abatement project was conducted in violation of law, including that gross asbestos debris was left behind.

125.   It was part of the scheme to defraud that the defendants conducted themselves in a manner to deceive the property owner into believing that the asbestos abatement had been done, that all of the asbestos had been removed, that the facility was safe to reoccupy, and that payment to PEC and **CES** should be made.

126.   For the purpose of executing, and attempting to execute the above-described scheme and artifice, defendants **NICOLE COPELAND, FRANK ONOFF** and **CES** did knowingly cause to be delivered, from and/to the Northern District of New York, by mail or private or commercial interstate carrier, according to the directions thereon the following items on or about the following dates:

38

a.     On or about June 30, 2006, **CES** mailed a close out package with fraudulent "passing" air monitoring reports to PEC and were provided to a representative of the Kellogg Free Library.

b.     On or about July 19, 2006 **CES** caused a fraudulent invoice to be mailed to PEC, who had billed Kellogg Free Library for services including air monitoring and laboratory analysis not performed in compliance with law, but for which CES represented had been properly performed.

All in violation of 18 U.S.C. § 1341 and 2.

## COUNT 14
## (False Statements Re: Aggressive Air Monitoring)

127.   On February 26, 2009, in the Northern District of New York, in a matter within the jurisdiction of the United States Environmental Protection Agency (EPA), an agency of the Executive branch of the United States Government, **FRANK ONOFF**, did knowingly and willfully make a materially false statement to EPA Special Agents, that is, **FRANK ONOFF** stated that all **CES** air technicians always brought leaf blowers and box fans with them to every asbestos project with which **FRANK ONOFF** was ever involved and that he knows they did because he saw it; whereas, in truth and fact, as he then and there well knew, he did not see **CES** air technicians bring leaf blowers and box fans to every asbestos project with which he was ever involved.

In violation of 18 U.S.C. § 1001.

39

## COUNT 15
### (False Statements Re: Aggressive Air Monitoring
### Alpha Chi Omega, 705 Walnut Street, Syracuse, NY)

128.   On or about August 22, 2007, in the Northern District of New York, in a matter within the jurisdiction of the United States Environmental Protection Agency and OSHA, agencies of the Executive branch of the United States Government, **ELISA DUNN** and **CES,** did knowingly and willfully make a materially false written statement, that is, as part of their project monitoring duties at an asbestos abatement project involving regulated asbestos containing material within the Syracuse University Alpha Chi Omega Sorority House, 705 Walnut Street, Syracuse, NY, **ELISA DUNN** and **CES** stated that:

"Project Monitor: Elisa Dunn/CES[.] Work Area(s): Basement 'clean-up' and pipe insulation removal.

I, Elisa Dunn Visually inspected the basement work area and found that abatement appears to meet the scope of work provided and that no visible debris is apparent[;]"

whereas, in truth and fact, as **ELISA DUNN** and **CES** then and there well knew, the abatement did not appear to meet the scope of work and substantial, readily visible debris still remained within the area purportedly cleaned and purportedly ready for final air monitoring and analysis.

In violation of 18 U.S.C. § 1001.

## COUNT 16
### (False Statements Re: Aggressive Air Monitoring

**Alpha Chi Omega, 705 Walnut Street, Syracuse, NY)**

129.    On or about August 23, 2007, in the Northern District of New York, in a matter within the jurisdiction of the United States Environmental Protection Agency and OSHA, agencies of the Executive branch of the United States Government, **ELISA DUNN** and **CES,** did knowingly and willfully make a materially false written statement, that is, as part of their project monitoring duties at an asbestos abatement project involving regulated asbestos containing material within the Syracuse University Alpha Chi Omega Sorority House, 705 Walnut Street, Syracuse, NY, **ELISA DUNN** and **CES** stated that:

"Project Monitor: Elisa Dunn/CES[.] Work Area(s): Emergency 'clean-up' in Basement[.] I, Elisa Dunn Visually inspected the basement work area and found that abatement appears to meet the scope of work provided (still), and no dust or debris is apparent[;]"

whereas, in truth and fact, as **ELISA DUNN** and **CES** then and there well knew, the abatement still did not appear to meet the scope of work and substantial, readily visible debris still remained within the area purportedly cleaned and purportedly ready for final air monitoring and analysis.   In violation of 18 U.S.C. § 1001.

05-28-09                        A TRUE BILL,

*[signature]*

Foreperson

41

ANDREW T. BAXTER
UNITED STATES ATTORNEY

By: Craig A. Benedict
    Assistant U.S. Attorney

Todd Gleason
Trial Attorney
U.S. Department of Justice
Environment and Natural
    Resources Division
Environmental Crimes Section